# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## No. 97-10598
_____


**GENARO RUIZ CAMACHO, JR.,**

                                        **Petitioner-Appellant,**

**versus**

**GARY L. JOHNSON, DIRECTOR, TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,**

                                        **Respondent-Appellee.**

_____

### Appeal from the United States District Court
### for the Northern District of Texas
### (3:95-CV-2539-G)
_____
April 17, 1998

Before DAVIS, JONES, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

Genaro Ruiz Camacho, Jr., a Texas death row inmate convicted of capital murder, seeks a certificate of probable cause to challenge the district court's denial of his petition for a writ of habeas corpus.  The certificate is **DENIED**; the stay of execution, **VACATED**.

                                I.

In 1990, Camacho was convicted and sentenced to death for the capital murder of David Wilburn.  During the guilt phase, as

_____

[*]    Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

discussed *infra*, three eyewitnesses testified that they saw Camacho shoot Wilburn; and the State also presented evidence of Camacho's involvement in the murders, a few days later, of Evellyn and Andre Banks, who had been present when Wilburn was murdered. During the punishment phase, the State presented evidence that Camacho had committed two additional murders.

The Texas Court of Criminal Appeals affirmed, *Camacho v. State*, 864 S.W.2d 524 (Tex. Crim. App. 1993); and the United States Supreme Court denied Camacho's petition for a writ of certiorari. *Camacho v. Texas*, 510 U.S. 1215 (1994).

Camacho filed a state habeas application on 20 March 1995. In mid-April, he moved for an evidentiary hearing; and, in mid-July, he requested discovery and, again, an evidentiary hearing. On 7 August, less than two weeks after the State filed its answer, the state habeas court entered findings of fact and conclusions of law recommending that relief be denied. In early October, in an unpublished opinion, the Texas Court of Criminal Appeals adopted those findings and conclusions and denied habeas relief.

Two weeks later, on 23 October 1995, Camacho filed a federal habeas petition, as well as a motion for stay of execution and an evidentiary hearing. The district court granted the stay and appointed counsel. On 24 November, the State filed an answer and moved for summary judgment. On 26 December, Camacho applied for funds to employ experts; three days later, he moved for leave to conduct discovery. In late May 1996, Camacho filed a supplemental application for funds to employ an expert. On 18 July 1996, the

magistrate judge denied Camacho's request for discovery, stating that the discovery sought constituted an "impermissible fishing expedition".

The magistrate judge reported findings of fact and conclusions of law in early January 1997, thoroughly analyzing Camacho's claims in painstaking detail, and recommended that an evidentiary hearing was not required and that habeas relief be denied. In late April 1997, the district court overruled Camacho's objections and adopted the findings and recommendation, with only slight revision.

The district court denied Camacho a certificate of appealability. But, because Camacho filed his habeas petition before 24 April 1996, the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), pre-AEDPA law applies. *See* **Green v. Johnson**, 116 F.3d 1115 (5th Cir. 1997). Camacho seeks a pre-AEDPA certificate of probable cause (CPC) from our court.

II.

In his CPC application, Camacho claims that the district court erred in the following ways:

1. By denying habeas relief on his claims

    (a) That he was denied due process of law and a fair trial by the prosecution's failure, in several instances, to disclose evidence favorable to the defense, in violation of **Brady v. Maryland**, 373 U.S. 83 (1963);

    (b) That he is entitled to a new trial because of newly discovered evidence which points directly to his innocence of the

- 3 -

crime for which he was convicted and that, to deprive him of his life without a jury's consideration of such evidence, will deprive him of his life without due process of law;

(c) That the prosecutor's use of peremptory challenges to exclude from the jury three members of minority races was based on racial grounds in violation of the Equal Protection Clause and *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny; and

(d) That he was denied his constitutional right to a fair trial by an impartial jury because of the admission of evidence relating to the murders of Evellyn and Andre Banks four days after the murder for which he was convicted and sentenced to death; and,

2. Concomitantly,

(a) By refusing to allow discovery, especially as to a recantation concerning the newly discovered evidence;

(b) By refusing to conduct an evidentiary hearing; and

(c) By denying funds to employ experts.

Furthermore, except for his *Batson* claims, Camacho maintains that, because the state habeas judge neither presided over his capital murder trial, nor conducted an evidentiary hearing, the presumption of correctness accorded to state court factual findings, pursuant to pre-AEDPA 28 U.S.C. § 2254(d), does not apply. The district court applied AEDPA in denying habeas relief; but, as discussed, we must, instead, consider Camacho's CPC motion under pre-AEDPA law. Nevertheless, we will, for purposes of this opinion, assume that the presumption does not apply (except, as

- 4 -

discussed *infra*, with respect to Camacho's **Batson** claims, as to which there are findings of fact by the trial judge).

To obtain a CPC, a habeas petitioner must make "a substantial showing of the denial of a federal right". **Lucas v. Johnson**, 132 F.3d 1069, 1073 (5th Cir. 1998) (internal quotation marks and citation omitted). "This standard does not require petitioner to show that he would prevail on the merits." **Drew v. Collins**, 5 F.3d 93, 95 (5th Cir. 1993), *cert. denied*, 510 U.S. 1171 (1994). Instead, the petitioner must "demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." **Barefoot v. Estelle**, 463 U.S. 880, 893 n.4 (1983) (emphasis in original; internal quotation marks and citation omitted).

Because several of Camacho's claims require consideration of the trial testimony of certain witnesses, that evidence, as presented by individual witnesses, rather than described collectively, is stated in considerable detail as a backdrop to our consideration of Camacho's CPC application. The facts are also summarized in our court's opinion affirming Camacho's federal kidnaping conviction; on appeal from that conviction, Camacho raised some of the same claims he asserts now as the basis for federal habeas relief. *See* **United States v. Jackson**, 978 F.2d 903 (5th Cir. 1992), *cert. denied*, 509 U.S. 930 (1993).

Sam Junior Wright testified for the State as follows. On 20 May 1988, at approximately 8:00 a.m., he and his three-year-old

son, Andre Banks, were upstairs in his residence at 7927 Nassau Street, in the Pleasant Grove area of Dallas, Texas. Wright lived there with Evellyn Banks (Andre's mother) and her two sons, who had already left for school. After hearing Evellyn Banks, who was downstairs at the time, cry out, Wright looked downstairs and saw a black man, whom he did not recognize, and another man, whom he recognized from prior drug-related dealings as "Gino". (At the time, Wright did not know "Gino's" last name; Dallas Police and the FBI later identified him as the petitioner, Genaro Camacho. The black man was later identified as Juan Jackson.)

The black man ordered Wright and his son downstairs. When Wright got there, he saw a white man (later identified as George David Cooke) whom he had never seen before. Another "white guy" (later identified as Larry Gene Merrell, referred to in the record as an "Indian"), whom Wright also had never seen before, came in through the back door. Gino did not have a weapon, but the other three intruders were armed. Gino (Camacho) asserted that Wright owed him $20,000, and stated that, if Wright did not get the money, he would kill Evellyn and Andre Banks. Gino then hit Wright.

Upon hearing a knock at the door, Gino took a .357 Magnum from one of his accomplices and stood behind the door. David Wilburn, Wright's driver, entered the house. Gino ordered Wilburn to lie face-down on the floor, and shortly thereafter shot him in the back of the head. Gino told one of his accomplices to handcuff Evellyn Banks.

Wright escaped through the front door while the intruders were distracted by the sound of the back door slamming. He saw a neighbor, and shouted to her to call the police. He eventually went to Evellyn's mother's home and told Evellyn's brother what had occurred. Evellyn's brother went to Wright's house and gave the name "Gino" to the police. Wright later called the FBI and, after his subsequent arrest (for failing to appear for sentencing on a 1985 drug conviction), gave a statement to the FBI. At the time of trial, Wright was serving a 22-year sentence in a federal institution for the 1985 drug conviction and for failing to appear for sentencing. On cross-examination, Wright testified that he had moved for reduction of sentence, but that the motion had not yet been heard.

One of Evellyn Banks' sons, Cecil DeWayne Banks, identified Camacho in court and testified that he had seen Camacho at the Nassau residence on about four occasions prior to the day of the incident, 20 May 1988; and that Camacho never came alone, but usually was accompanied by at least two or three other men. Evellyn Banks' brother, Darrell Anthony Banks, testified that he met Camacho at the Nassau house; and that on one occasion Camacho mentioned that Wright owed him money.

Sabrina Wilson testified as follows. In May 1988, she lived across the street from Wright's house. Around 8:30 a.m. on 20 May 1988, when crossing the street after leaving a friend's house, she saw a white car, and Wright shouted at her to call the police, because the people in the car had tried to kill him. She saw a

driver and passenger, but did not know if anyone was in the back seat. Wilson was six to eight feet from the driver's side of the car, and got a close look at the driver, whom she identified in court as Camacho.

After calling the police, Wilson went to work. A detective showed her some photographs the next day (21 May), and she identified Camacho's photograph. (Outside the presence of the jury, in an identification hearing, Wilson testified that she was shown the photographs "within a day or two" after the incident.)

Retired Dallas Police Officer L. C. Lake testified that, while on patrol, he was called to Wright's house; that he observed the burglar bars opened, the front door ajar, and a cut chain and padlock on the ground; and that, inside the front door, he saw a black male who appeared to be dead.

Dallas Police Detective Michael W. Black testified that he responded to the call on Nassau on 20 May 1988; that a chain had been cut off the burglar bars on the front porch and pieces of the chain were on the ground; that the front door had been forced open, and pieces of the door frame were in the living room inside the front door; that Wilburn's body was face-down in the living room just inside the front door; that the bullet entered the lower part of the back of Wilburn's head and exited through his cheek; that bullet fragments were found on the rug just beneath Wilburn's head, and a large bullet fragment was on the carpet three feet from Wilburn's head; that it appeared to have been an execution-type killing; that drugs and drug paraphernalia were found in the house;

and that the fingerprints found at the scene were not identified as those of any of the individuals arrested.

Following a competency hearing outside the presence of the jury, accomplice George David Cooke testified as follows. Around 6:00 a.m. on 20 May 1988, Camacho awakened him and said that he wanted Cooke to go with him "to collect some money". Cooke, Jackson, and Merrell traveled to Wright's house in a white Lincoln driven by Camacho. Jackson, who was riding in the front passenger seat, took two semiautomatic pistols and a .357 Magnum from a bag under his feet and distributed them. When they arrived at Wright's house, pursuant to Camacho's orders, Jackson cut the lock on the burglar bars around the front porch; and Merrell went around the side of the house and cut the telephone lines. Camacho kicked the front door open. At some point, the .357 Magnum was handed to Cooke. Jackson brought Sam Wright and Andre Banks downstairs, and Camacho asked Wright what happened to his money. Camacho mentioned that he had "left his boy" (referring to heroin) with Wright.

Upon hearing a knock at the door, Camacho stepped behind the door and opened it; Jackson told the person at the door (Wilburn) to come in. Camacho shut the door behind Wilburn, got the .357 Magnum, ordered Wilburn to get on his knees, patted him down, and then ordered him to lie face-down on the floor. Camacho told Jackson to shoot Wilburn if Wilburn moved or spoke. After questioning Wright again about the money Wright owed him, Camacho walked over to Wilburn, put the gun to the back of his head, and shot him. After further questioning of Wright about his money,

- 9 -

Camacho ordered Jackson to handcuff Evellyn Banks, and said that "we had to take them all with us". As they were leaving the house, Wright ran away. Camacho, who was driving, ordered Jackson to get Wright, but Jackson said he could not catch him. As they were driving away, they saw Wright running across a field and Camacho told Jackson to shoot him, but Jackson said he was too far away.

Cooke testified that the captives were taken to a Dallas apartment he rented with Eddie Blaine Cummings. After three days, Camacho, Cooke, Spencer Charles Stanley, and Evellyn and Andre Banks traveled to Oklahoma in Cooke's car. Stanley had given Cooke a list of items that he wanted Cooke and Camacho to buy before the trip, including "tape, a knife, pillow, some lime ... and some rope". The group went to a motel in Ardmore, Oklahoma, arriving after midnight. Stanley left to "dig a hole". Camacho assured Evellyn Banks that he had ordered an airplane to be flown to an airstrip, and that he would see that she and Andre Banks were flown "somewhere where she had some relatives".

Cooke testified further that, at approximately 10:00 p.m. that night, Camacho, Cooke, Stanley, and Evellyn and Andre Banks left the motel, ostensibly to go to the airstrip. After driving to a remote area, the group walked through some woods, following Stanley, who was carrying Andre Banks on his back, to the grave Stanley had dug. Stanley threw Andre Banks into the grave and shot him, and then shot Evellyn Banks. Camacho ordered Stanley "to use the rest of the bullets" on Andre Banks, who was "still making some noises".

After burying Andre and Evellyn Banks, Camacho, Stanley, and Cooke drove to Lake Texoma to dispose of the shovel, pickaxe, and weapon before returning to the motel in Ardmore. They were joined there by Cummings and Pamela Miller; and then all of them returned to Dallas.

Cooke testified that he had been arrested on 15 August 1988, and charged with two counts of aggravated kidnaping. After his arrest, he led the FBI to the grave of Evellyn and Andre Banks. At the time of the state trial, he had entered a guilty plea in federal court and was to be sentenced approximately a month later, in mid-May 1990. He had also been indicted as an accomplice to murder and kidnaping in Dallas County, and intended to plead guilty to those charges.

On cross-examination, Cooke testified that he and Cummings rented the car that was used to drive to Wright's house on 20 May 1988; that he purchased the semiautomatic weapons used at Wright's house; and that he rented the motel room in Oklahoma. He was initially charged with capital murder, but that charge was later reduced to murder. Pursuant to his plea agreement for the aggravated kidnaping charge in federal court, his sentence was to be capped at 24 years, although the maximum punishment for that offense is life imprisonment.

Another accomplice, Larry Gene Merrell, also testified for the State. In most respects, Merrell's testimony about the events at Wright's house was consistent with Cooke's. However, according to Merrell, Cooke (rather than Jackson) distributed the weapons in the

car; Merrell (rather than Camacho) opened the door for Wilburn; and Merrell (rather than Camacho) was standing behind the door. Merrell's testimony was also consistent, for the most part, with Wright's testimony; however, Merrell testified that he entered Wright's house through the front door (rather than the back, as Wright testified). Merrell testified further that he saw Camacho shoot Wilburn in the back of the head; and that he went back to Oklahoma on the Sunday following the murder (22 May) and did not see Camacho or the kidnaped victims again.

Merrell had been arrested on 16 September 1988, and made a statement to the FBI. At the time of the state trial, he had pleaded guilty in federal court to one count of kidnaping and was awaiting sentencing; and he intended to plead guilty to a Dallas County kidnaping charge. On cross-examination, Merrell testified that, pursuant to his plea bargain, he was subject to a maximum punishment of eight years.

FBI Special Agent Tase Bailey testified regarding the investigation and arrests of the suspects, as follows. On the evening of 21 May, FBI Agent Figueroa contacted him and advised that he had developed the name of a suspect. At that time, they knew only that the suspect was named "Gino" and that he had been arrested previously by another police department. The next morning, 22 May, they determined that the suspect's name was Genaro Camacho. They obtained a photograph of Camacho, and Dallas Police conducted photographic line-ups. They were also trying to identify a white male, a black male, and possibly another Hispanic male.

Agent Bailey testified that Cooke led investigators to the grave of Evellyn and Andre Banks, and to the location where the weapon used to murder them had been thrown into Lake Texoma.

On cross-examination, Agent Bailey testified that Cummings and Cooke were close associates; that Cummings selected the car used in the kidnaping and ordered Cooke to purchase the semiautomatic weapons; that Cooke stated that the handcuffs used on Evellyn Banks were obtained from Cummings; that Cummings offered jewelry, which he had stolen from his mother, to Cooke in exchange for the weapons; and that Merrell and Stanley were hometown friends of Cummings. On redirect examination, Agent Bailey testified that the reason Camacho, Cummings, and the others came together in Dallas was narcotics activity — Camacho was related to persons in Mexico, and they planned to fly marijuana into the Dallas area and distribute it from there; and that, when Camacho was arrested on 31 March 1989, as he came across the bridge from Mexico into McAllen, Texas, he used the name "Tomas Sanchez".

The defense case consisted of further cross-examination of Wright, Agent Bailey, and Cooke. When Cooke and Wright were asked to demonstrate how Camacho shot Wilburn, Cooke indicated that Camacho held the gun in his left hand; Wright, that Camacho used his right.

The defense also presented the testimony of a Tarrant County probation officer and a psychologist. The probation officer testified that Wright had been placed on probation in 1981 for unlawful possession of a controlled substance (78 pounds of

marijuana); that he had failed to report to the probation office at least 10 times; and that his probation had never been revoked. The psychologist testified that, after conducting a series of psychological tests on Cooke, at the request of Cooke's attorney, he determined that Cooke was insane on 20 May 1988, and that Cooke's "recollection of facts is ... very problematical ... [because] he has delusional disorder problems". The defense theory was that Wright and Cooke were not credible witnesses, and that someone other than Camacho shot Wilburn.

Cummings testified as a rebuttal witness for the State, as follows. He met Camacho about two months prior to Wilburn's murder, and he and Camacho discussed "making some big money" by flying marijuana into the United States from Mexico. On 20 May 1988, he and Pamela Miller were at the apartment when Evellyn and Andre Banks were brought there by Camacho, Cooke, Merrell, and Jackson. Camacho told him that he (Camacho) had ordered Cooke to kill "the man", but that Cooke could not follow orders, so he (Camacho) had to "kill the man". Although Camacho had discussed killing Merrell, it was agreed that Cummings would take Merrell back to Oklahoma and would try to locate an airplane to use in transporting Camacho to Mexico and then in transporting marijuana. Cummings had been arrested on 5 August 1988, and indicted in federal court as an accessory; had pleaded guilty; and was awaiting sentencing.

FBI Special Agent Jose Figueroa also testified as a rebuttal witness for the State, as follows. On 20 May 1988, he received a

call from the Dallas Police about the murder and kidnaping. He went to the neighborhood and spread the word that he needed to talk to Wright as soon as possible. On 21 May, at approximately 10:00 p.m., Wright called him and stated that the shooter was named "Gino". On 22 May, based on information provided by Wright in the 21 May telephone conversation, he learned that "Gino" was Camacho. After Wright was arrested, Agent Figueroa interviewed him and showed him a photographic spread, from which Wright identified Camacho's photograph. On cross-examination, Agent Figueroa testified that there is no physical evidence that ties Camacho to Wright's house or to the grave site in Oklahoma.

Finally, Jeaneene Elizabeth Wallace testified as a rebuttal witness for the State, as follows. Her friend, Cummings, introduced her to Camacho. In early May 1988, she was with Camacho, who was angry, and who "said that this man had owed him a lot of money, like $8,000.00, and then he grabbed me by the throat and he stuck his thumb in my throat and he said he was going to kill this man and his family because he grew good coca and he grew good marijuana and that this man owed him money".

## A.

Camacho contends that the prosecution violated **Brady** by failing to disclose: (1) the full extent of Cooke's plea bargain agreement with the State; (2) that the State's original theory involved three, rather than four, suspects, as reflected in the initial prosecution report prepared by Dallas Police Officer T. J. Barnes; (3) the affidavit of James Scott, who witnessed some of the

events surrounding the murder, and the fact that Scott identified someone other than Camacho from a photographic lineup; (4) that Jane Wallace did not identify Camacho from a photographic lineup as being at Wright's house on 20 May 1988; and (5) that Rose Wallace was coerced by police to make a positive identification of Camacho when she was shown a photographic lineup. (Camacho asserted a similar *Brady* claim on appeal from his federal kidnaping conviction. *See United States v. Jackson*, 978 F.2d at 912.) For these *Brady* claims, Camacho maintains that the district court also erred by denying his discovery and evidentiary hearing requests.

As is well-known, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution". *Brady*, 373 U.S. at 87 (emphasis added). In *United States v. Bagley*, 473 U.S. 667 (1985), a majority of the Court held that, regardless of whether requested by the accused, favorable evidence (exculpatory or impeachment) is *material* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different". *Bagley*, 473 U.S. at 682 (opinion of Blackmun, J.); *id*. at 685 (White, J., concurring in part and concurring in judgment). And, in *Kyles v. Whitley*, 514 U.S. 419 (1995), the Court emphasized that *Bagley* materiality "is not a sufficiency of the evidence test", *id*. at 434; and that, in determining materiality, the suppressed evidence must be "considered collectively, not item-by-item". *Id*. at 436. We

review the **Brady** ruling *de novo*. *See **East v. Johnson***, 123 F.3d 235, 237 (5th Cir. 1997).

1.

Before considering, collectively, the materiality of the allegedly undisclosed items, Camacho's contentions and the prior proceedings with respect to each of the items are summarized.

a.

Camacho contends that the State's failure to disclose the extent of eyewitness Cooke's plea bargain agreement with the State violated his rights under the Fifth, Sixth, and Fourteenth Amendments, because the full extent of the agreement was critical to a determination of Cooke's credibility. Concomitantly, he asserts that the district court erred by denying his request to depose Cooke about Cooke's understanding of the plea agreement, and by denying his request for an evidentiary hearing to resolve disputed factual issues which were not fully and fairly resolved in state court.

At a pretrial hearing on 19 February 1990, before the commencement of testimony in Camacho's capital murder trial, the attorney who represented Cooke in federal court testified that his understanding of the state plea bargain agreement was that it was for a life sentence; the attorney who represented Cooke on the state charges, that he had no knowledge regarding the agreement.

As stated, Cooke testified at trial that his agreement with the State was that he would not be charged with capital murder and would receive a life sentence in exchange for his guilty plea to

kidnaping and murder.  And, at the close of the State's case-in-chief, the prosecutor stated that Cooke had agreed to plead guilty to the Dallas County charges and that, in exchange for his plea, the State had agreed that, if Cooke testified truthfully, it would recommend a life sentence to be served concurrently with any sentence previously imposed in federal court.  When Cooke was recalled by the defense, he testified that he was "exposed to two life sentences in the state".

Approximately a month after trial, in June 1990, Camacho moved for a new trial, alleging that, in return for his testimony, Cooke had received additional promises from the State that were not revealed to defense counsel and were not presented to the jury.  At a hearing on the motion, Camacho introduced a 10 May 1990 letter (dated two days after Camacho was sentenced to death), from Hugh Lucas, lead counsel for the State at Camacho's trial, to Dennis Brewer, Cooke's lawyer on the federal charges, to which was attached a page outlining the State's plea agreement with Cooke. The attachment stated that Cooke had not been indicted for capital murder; that the State agreed to recommend a life sentence, concurrent, on the Dallas County case; that, upon discharge of Cooke's federal sentence, or the expiration of 20 calendar years, whichever is greater, the State would recommend parole and that Cooke be released from incarceration; and that, after the expiration of 30 calendar years, the State would recommend that Cooke be discharged from all Dallas County sentences.

Camacho's trial counsel, Joseph Montemayor and Julius Whittier, testified that they did not learn of the entire agreement until *after* Camacho was sentenced to death. On the other hand, Brewer (counsel on federal charges) testified that the attachment to Lucas' 10 May letter reflected his understanding of the agreement between Cooke and the State; and that the agreement had been reached prior to Cooke's testimony in Camacho's trial. When asked by Camacho's counsel if it was a "substantial benefit" for the State not to oppose parole eligibility, Brewer testified that "it's a terrible detriment ... if the State does oppose it ... compared to the other alternative I guess it would be considered a benefit."

Lucas testified that he never agreed to recommend parole for Cooke; that the 10 May letter was prepared hurriedly, in response to a request by Brewer, who needed the letter in federal court that day, and mistakenly included the terms regarding parole recommendation; that he was out of town when Cooke entered his guilty plea, and did not have an opportunity to correct the agreement; and that Cooke's testimony at trial set out the plea agreement as he believed it to be at that time.

Edwin King, Cooke's attorney in state court, testified that the plea agreement was that Cooke was going to get a life sentence; and that he never saw Lucas' 10 May letter until the day Cooke entered his guilty plea in state court. King testified further that, in his opinion, the State's recommendation regarding parole was not "worth the paper it's written on", but that "it made

Cook[e] feel better"; that he told Cooke that the agreement was that he was going to get life sentences, concurrent, and that, at a minimum, the State would not oppose his eligibility for parole; that both he and Brewer told Cooke that any parole decision would be made by the Board of Pardons and Paroles, not by the Dallas County District Attorney's Office; and that the State's agreement not to oppose parole eligibility "wasn't so important that [Cooke] would have changed his mind", because Cooke was more concerned about his federal sentence.

Cooke, who was incarcerated in Oklahoma at the time, did not testify at the hearing on the new trial motion, because Camacho's counsel was unable to secure his presence. (There is no indication in the record that Camacho's counsel sought a continuance of the hearing in order to obtain Cooke's testimony.) At the conclusion of the hearing, the trial court denied the motion.

The state habeas court concluded that Camacho was procedurally barred from raising the issue of whether the State failed to reveal the extent of Cooke's plea agreement, because he did not raise the issue on direct appeal. Alternatively, it found that Camacho failed to prove that an agreement existed outside the papers signed in Cooke's case.

The district court held that disclosure of the State's agreement to recommend parole was not required, because those terms did not become part of the plea agreement until after Camacho's trial ended; and that, although the State had agreed, prior to Cooke's testimony, that it would not actively oppose parole for

Cooke at the end of his federal sentence, such agreement was not required to be disclosed because it was immaterial. The court rejected Camacho's request for an evidentiary hearing, stating that Cooke's testimony was unnecessary, because "the record makes it clear that no **Brady** violation occurred".

b.

The next claimed **Brady** violation is not disclosing the initial prosecution report of Dallas Police Officer T. J. Barnes, which reflects the State's initial theory that the offense involved three perpetrators. Camacho asserts that Barnes' report, which states that Wright could testify that three men entered his house, could have been used to impeach Wright's trial testimony that four entered. And, again, he contends that the district court erred by denying his discovery and evidentiary hearing requests on this issue.

The state habeas court rejected this claim, after making detailed findings; for example, that the State's initial theory was readily available to the defense through medical reports, and because the substance of Barnes' report was identical to the affidavit supporting the arrest warrant (a public record).

The district court held that Wright's trial testimony that three men were in his house when he was forced downstairs, and that a fourth entered later, was consistent with the statement in Barnes' initial report that Wright could testify that Camacho and two other men broke into his house. It concluded that, in the light of Cooke's and Merrell's testimony, which corroborated

Wright's testimony that four men entered and that Camacho shot Wilburn, the collateral nature of the alleged contradiction between Barnes' report and Wright's testimony compelled the conclusion that the undisclosed impeachment evidence was not material.

c.

The prosecution is claimed to have also violated *Brady* by failing to disclose the affidavit of James Scott, given to Dallas Police on the day of the incident, 20 May. Camacho asserts that Scott's testimony would have been favorable to him, because Scott saw only three men leave Wright's house, and because Scott saw a black man driving the car away from Wright's house, which would have contradicted Sabrina Wilson's testimony that Camacho was driving.

Scott's 20 May affidavit states that he saw a Mexican man, a white man, and a black man at Wright's house that morning; that he saw three men drag Evellyn Banks and her son to the car and put them in the back seat; that the white man and the Mexican man sat in the back seat with Evellyn and Andre Banks; and that "the colored man" drove.

Scott did not testify at Camacho's capital murder trial, but he testified for the defense in Camacho's federal kidnaping trial. Consistent with his affidavit, he testified that he saw three men arrive at, and leave from, Wright's house on 20 May 1988; and that the black man was driving the car as it left. He described the Mexican man as having "sort of long" hair, "back on his neck".

But, when asked at the federal trial whether there was any question in his mind about who was driving the car, Scott replied: "That's what I thought.  I was scared because I didn't want to get too close."  And, when then asked whether he saw only three men get into the car, Scott stated: "That's all I seen.  It may have been more, but that's what I seen go to the car."  When the car came back around the block, Scott did not know whether the black man was still driving.

Scott testified further at the federal trial that a detective showed him some photographs of some "Spanish" individuals the next day, and he indicated to the detective the man he thought he had seen, but the detective told him he had picked the wrong one.  On cross-examination, Scott testified that he did not see the men drive up and did not see how many people got out of the car; and that Sabrina Wilson was in a position to see who was driving.

In its response to Camacho's state habeas application, the State submitted the affidavit of prosecutor Lucas, in which he stated that he interviewed Scott in April 1990, prior to Camacho's state trial, and that Scott told him he was shown a photographic lineup and could not identify anyone.

The state habeas court rejected this claim, with extensive findings; for example, that Scott's identity as a potential witness was disclosed to the defense; that any inconsistency between Scott's affidavit and the statements of other witnesses was not material, because Scott was equivocal in his identification of the driver of the getaway car, and his testimony *did not exclude*

Camacho from being present at, and responsible for, the murder; that Scott's testimony that he was shown a photographic lineup was not credible; but that, even if he had been shown the lineup, the fact that he may have identified someone other than Camacho was not exculpatory, because Scott did not witness the murder and was not called as a witness.

Likewise, the district court held that Scott's affidavit was not inconsistent with the state trial testimony that three men entered the front door of Wright's residence, while the fourth went around the side of the house to cut the telephone line. It stated that, because three eyewitnesses testified that they saw Camacho shoot Wilburn, and because Scott testified at Camacho's federal trial that, although he only saw three men come out of the house, there may have been more than three men involved, Scott's affidavit was not material.

The district court stated further that Scott's statement regarding the driver was not material to whether Camacho murdered Wilburn. It noted also that Scott testified at the federal kidnaping trial that he "thought" the black guy was driving, but was scared and did not want to get too close, and that Wilson's testimony that Camacho was driving was corroborated by the testimony of Merrell and Cooke that Camacho drove the car to and from Wright's house.

The district court concluded that Camacho had failed to overcome the presumption that the state habeas court's findings regarding whether Scott was shown a photo spread and did not

identify Camacho were correct.  Finally, it held that the information in Scott's affidavit could have been discovered through the exercise of reasonable diligence, because Scott's name was provided to defense counsel in the State's first witness list, filed 15 December 1989.

### d.

The fourth *Brady* claim is for not disclosing that Jane Wallace, who did not testify at Camacho's capital murder trial, had failed to identify him as one of the perpetrators.  Jane Wallace testified for the defense in Camacho's federal trial that, on the morning of 20 May 1988, she saw a "Mexican" at Wright's house, but could not see his face because his back was turned toward her; and that she thought she saw four to five men coming out of Wright's house.

She testified further that a detective showed her some photographs; that, when asked if she had ever seen any of the men in the photographs, she pointed out Camacho's photograph, and signed the back of it, but she did not tell the detective where she had seen the man before, because he did not ask; and, that she recognized Camacho's photograph because she had seen him at Wright's residence on previous occasions, but she did not see him there on the morning of 20 May 1988.  She testified further that she did not remember seeing Camacho that morning, but that he could have been there.

The state habeas court found that Jane Wallace's testimony was not exculpatory, because she did not claim that Camacho was not

present at Wright's house on the morning of the offense; and that her identity was disclosed to the defense prior to trial.

The district court held that **Brady** does not require the disclosure of such evidence, because Jane Wallace did not tell the police when she had seen Camacho at the time she identified his photograph; accordingly, the State did not know that Jane Wallace identified Camacho's photograph because she had seen him at Wright's house on occasions prior to the murder, but that she did not see him there on the morning of the murder.

Camacho contends that the district court's conclusion is contradicted by Detective Barnes' investigative notes, which state that "Jane Wallace ... identified Camacho and said she had seen him at Sam's house numerous times before". He asserts that he is entitled to an evidentiary hearing to resolve the factual dispute regarding whether the police knew the basis for Jane Wallace's identification of Camacho.

e.

The final **Brady** claim is for failing to disclose that Rose Wallace had been coerced into identifying Camacho's photograph. Camacho asserts that her testimony would have been favorable to his defense, because it would have discredited the police investigation of the State's theory of the case; alternatively, that reasonable jurists could disagree on whether her testimony would be favorable, and that the questions surrounding this evidence, including the display of the photographic spreads, are at least adequate to deserve encouragement to proceed further (obtain CPC).

- 26 -

Rose Wallace did not testify in Camacho's capital murder trial, but she testified for him at his federal trial, as follows. On 20 May 1988, she saw Evellyn Banks in handcuffs sitting in the car by herself, but did not see Andre Banks; she saw two men outside Wright's house; and she had seen "the Mexican guy" in the newspaper (as discussed below), but he had his back toward her. Later, a police officer showed her three photographs and asked her if she could identify anyone. She told him that she could not, because the man had his back to her. The officer told her she had to pick one, and showed her which photograph to pick. Although she signed the back of Camacho's photograph, she did not know if the man she saw at Wright's house was Camacho; the photograph she signed was the same one that was in the newspaper.

In response to Camacho's state habeas application, the State submitted the affidavit of Detective Barnes, who stated that Camacho's photograph did not appear in the newspaper until *after* Rose Wallace identified it.

The state habeas court found that Rose Wallace's allegations of coercion were not credible, and that Camacho had failed to prove that any coercion was exculpatory, because Rose Wallace was not called as a witness in his capital murder trial.

The district court held that, because Rose Wallace did not testify at Camacho's capital murder trial, her forced identification was not favorable to his defense, because he could not use the evidence to impeach her. The court stated further that her testimony would not have materially helped Camacho's defense,

because she testified at the federal kidnaping trial that she could *not* identify the Hispanic male who was present at Wright's house on the day of Wilburn's murder, because his back was toward her.

2.

As discussed *supra*, we assume that the presumption of correctness does not apply to the state habeas court's underlying factual findings on the **Brady** claims. In addition, we assume that Camacho's claim regarding Cooke's plea agreement is not procedurally barred. Nevertheless, considering the allegedly undisclosed evidence *collectively*, we conclude that Camacho has not shown that there is a *reasonable probability* that, had the evidence been disclosed, the result of the proceeding would have been different.

We agree with the district court that Camacho has not shown that the State suppressed an agreement to recommend parole or discharge for Cooke, because the evidence reflects that the agreement did not exist until after Camacho's capital murder trial, when the prosecutor mistakenly included those terms in a hurriedly-drafted letter for Cooke's federal counsel. Although the State did not disclose to Camacho's counsel that it had verbally agreed to not oppose Cooke's parole, there is no basis for inferring that such an agreement influenced Cooke's testimony, in the light of the evidence that Cooke was well aware that the Dallas County District Attorney's Office had no influence over parole decisions made by the Texas Board of Pardons and Paroles. (His counsel on the State

charges testified that he and the attorney representing Cooke in federal court so informed Cooke, as noted *supra*).

Cooke's eyewitness testimony about Wilburn's murder was corroborated by the eyewitness testimony of Wright and Merrell. It was further corroborated by Wilson's testimony that Camacho drove the car away from the scene of the murder, and by the testimony of Cummings, to whom Camacho admitted committing the murder. Considering the jury's knowledge that Cooke had avoided a capital murder charge by pleading guilty, there is no reasonable probability that its determination of his credibility would have been affected by knowledge of whatever marginal benefit Cooke might receive from the State's agreement not to oppose his parole. *See Pyles v. Johnson*, ___ F.3d ___, ___, 1998 WL 94881, at *13 (5th Cir. 1998) (where State's witness admitted that self-interest motivated his testimony, disclosure of the terms of a better deal than described by the witness at trial "would have at best had a marginal negative impact on the jury's credibility assessment").

The State asserts that Camacho has not demonstrated that the evidence regarding James Scott and Jane and Rose Wallace was suppressed, because each of their names appeared on the State's first witness list, filed three months before trial, and the defense, exercising reasonable diligence, could have interviewed each of them and discovered what each knew about the events of 20 May 1988. Although the State is correct that "[a] *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information", *Williams v. Scott*, 35 F.3d 159, 163

(5th Cir. 1994), *cert. denied*, 513 U.S. 1137 (1995), we will make yet another assumption beneficial to Camacho: that the disclosure of the identities of these witnesses was not adequate to apprise the defense of their knowledge of the relevant events. Nevertheless, we conclude that the suppressed evidence, *to the extent that it was exculpatory*, was *not* material.

None of the three claimed to have witnessed the murder, and their testimony was not consistent. Even assuming that Rose Wallace was coerced into identifying Camacho, her testimony would not have impeached that of the eyewitnesses to the murder. The statement in the investigative notes that Jane Wallace stated that she had seen Camacho at Wright's house numerous times before does not support an inference that she told the police officer that she did not see Camacho at Wright's house on the day of the murder. Moreover, *neither* Rose nor Jane Wallace could say that Camacho was *not* present at Wright's house on the morning of 20 May, because both stated that the "Mexican" man had his back to them.

Scott's statement that he saw three men enter the house and three men drive away from the house is not inconsistent with the trial testimony that three men (Camacho, Cooke, and Jackson) entered the front of the house, while the fourth (Merrell) went around to the back of the house to cut the telephone line, and entered the house later. The fact that Scott did not see the fourth man is understandable, because he did not see the men get out of the car and did not look outside until he heard the noise made by the three men who were breaking in at the front door.

Likewise, Scott's statement that he saw three men leave was not necessarily inconsistent with the trial testimony that Camacho sent Jackson to look for Wright, who had escaped. Moreover, at the federal kidnaping trial, Scott was equivocal about whether three men or more got into the car after coming out of Wright's house; as noted, he stated: "That's all I seen. It may have been more, but that's what I seen go to the car."

Scott's statement that he thought that a black man was driving as the car departed, but was unsure who was driving when the car came back around the block, is insignificant and does not exculpate Camacho from responsibility for the murder, because, as noted, Scott admitted that he was scared to get too close, and that Wilson, who positively identified Camacho as the driver, was in a better position to do so.

Contrary to Camacho's assertion, Wilson was not the only disinterested witness who placed Camacho at the scene of the murder. Wright also placed him there. Camacho has not shown that Wright had a motive to identify Camacho, rather than one of the others, as the shooter.

Scott's alleged "misidentification" also is not exculpatory, because Scott could not identify any of the perpetrators. Although Scott apparently told a police officer during the investigation that the "Mexican" had "shoulder length" hair, he testified at the federal trial that it was "[n]ot real long" and was "back on his neck". In the light of the fact that the photographs of Camacho indicate that his own hair was fairly long, he has not demonstrated

that Scott's description fit any other possible suspect more than it fit him.

Even assuming that Scott was shown a photographic lineup, Scott's federal trial testimony that a detective told him that he had picked the wrong photograph out of a lineup does not undermine our confidence in the verdict. Scott *did not claim* to have witnessed the murder, and three of the eyewitnesses to it testified that Camacho shot Wilburn. Their testimony was corroborated by Wilson's identification of Camacho as the driver of the car and by Cummings' testimony that Camacho admitted to him that he committed the murder.

The fact that the State's initial theory was that three men committed the offense was a matter of public record and was available to Camacho and his counsel. But, even assuming that the State had a duty to disclose it, this is neither material nor exculpatory. That Detective Barnes' initial report indicates three suspects were involved does not tend to demonstrate that Camacho was not one of them. Nor, again, does it undermine the testimony of three eyewitnesses that Camacho shot Wilburn.

Camacho asserts that he was entitled to discovery and an evidentiary hearing, because there is a factual dispute regarding when the FBI and Dallas Police learned of Camacho's identity and obtained a photograph of him. This contention is based on Wilson's trial testimony that she was shown a photographic lineup "the day after" (21 May) the offense occurred, which purportedly contradicts other evidence that the FBI and Dallas Police did not learn

Camacho's identity until 22 May, after Wright's telephone conversation with FBI Agent Figueroa on the evening of 21 May. Camacho asserts that the inconsistency raises the "all important question" of how the FBI or Dallas Police Department learned of Camacho's identity prior to his being identified by Wright.

The alleged discrepancy was apparent at Camacho's state trial, and could have been explored then. In any event, the record demonstrates that, in Wilson's state court testimony, she was mistaken about the lineup date. As stated, in the identification hearing outside the presence of the jury immediately prior to her trial testimony, Wilson stated that she was shown the lineup a day or two after the incident. At the federal trial, Wilson testified that she gave a description of the suspects to FBI agents on 21 May, but was not shown any photographs at that time, and then, on 22 May, Detective Barnes showed her a photographic lineup. Her testimony is corroborated by Agent Figueroa's testimony at the federal trial that he first obtained a photograph of Camacho on 22 May and gave that photograph to Detective Barnes for use in a photographic lineup to be shown that day to Wilson.

In sum, the net effect of evidence that the State's initial theory involved three suspects rather than four; that a witness who did not testify at trial saw only three suspects and thought the driver of the getaway car was black rather than Hispanic; that witnesses who did not testify at trial were unable to identify Camacho as being at Wright's house on 20 May; that another witness who did not testify at trial was coerced into identifying Camacho's

photograph; that one witness was mistaken as to when she was shown a photographic lineup; and that the State had agreed not to oppose parole for one of the accomplice eyewitnesses, is not sufficient to undermine our confidence in the verdict. Therefore, we conclude that there is no reasonable probability that, had such evidence been disclosed, the outcome of Camacho's trial would have been different.

Concomitantly, because Camacho has not demonstrated the existence of a factual dispute that, if resolved in his favor, would entitle him to relief, the district court did not err by denying his requests to employ an expert, and for discovery and an evidentiary hearing. *See* **Perillo v. Johnson**, 79 F.3d 441, 444 (5th Cir. 1996) (a federal habeas petitioner is entitled to discovery and an evidentiary hearing only "[w]hen there is a factual dispute [that], if resolved in the petitioner's favor, would entitle [him] to relief and the state has not afforded the petitioner a full and fair evidentiary hearing"); *see also* **Harris v. Johnson**, 81 F.3d 535, 540 (5th Cir.), *cert. denied*, ___ U.S. ___, 116 S. Ct. 1863 (1996).

## B.

Camacho contends that he is entitled to a new trial because of newly-discovered evidence pointing to his innocence, and that executing him without a jury's consideration of such evidence would deprive him of his life without due process. Along this line, he contends that he is entitled to discovery, funds with which to employ an expert witness, and an evidentiary hearing.

"[I]t has long been a habeas rule that 'the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus.'" *Lucas v. Johnson*, 132 F.3d at 1074 (quoting *Herrera v. Collins*, 954 F.2d 1029, 1034 (5th Cir. 1992), *aff'd*, 506 U.S. 390 (1993)). "[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera*, 506 U.S. at 404. Camacho appears to rely on the Supreme Court's assumption, *arguendo*, that "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim". *Id.* at 417. The Court noted that "the threshold showing for such an assumed right would necessarily be extraordinarily high". *Id.*

Camacho's claim is based on the 14 August 1992 affidavit of Bobby Newton (*dated more than four years after the murder*), which was attached to Camacho's state habeas application. The affidavit states that, early in the morning on 19 May 1988 (the day *before* the murder), Newton was sitting on the front porch of a friend, Danny Sheffield, directly across the street from Wright's house; that three men arrived in a big, light-colored car and knocked on the door of Wright's house; that Wilburn opened the door; that one of the men shot Wilburn in the back of the head, causing Wilburn to

fall to the floor, face-first; and that he knew Camacho, but did not see him at Wright's house on the morning Wilburn was murdered.

In response to Camacho's state habeas application, the State submitted the affidavit of Detective Barnes, who stated that the events described in Newton's affidavit did not match the physical evidence; and the affidavits of long-time residents of the neighborhood, who stated that they did not know either Newton or Sheffield.

The state habeas court rejected this claim, and made extensive factual findings; for example, that Newton was not credible, because he did not assert that he was present on the date the offense occurred, and because the events described by Newton were contrary to the physical and eyewitness evidence.

The district court held that it was unnecessary to consider whether the state court's findings were supported by the record, because Newton subsequently recanted the contents of his affidavit. In a 27 May 1996 letter to Camacho's counsel, Newton stated:

> Mr. Murphy I am writing you back to let you know that I don't wish to testify for you or the State because when I gave you this so-called affidavit 4 years ago it was because at that time I need a lawyer to help stop me from coming to T.D.C. Mr. Murphy I am very sorry about this man but I can't an will not help him because I wasn't there. I lie so you would help me an I was willing to lie for him but since I have done my time here in T.D.C. without your help why would you have the nuts to send me these papers. I tell you this one thing if you are the State have me come to court I will tell those people I didn't see nothings also my mother and father didn't see anything so they better not come up hurt in any way.... But I will not lie for him or you so Mr. Murphy please let me do my time an go

home to my family....  I will not testify for him or against him.  I didn't see or hear anything.  I was running from the Law myself when I seen you I seen my way out of here but you didn't help me so I will not lie for you that life so don't write or send me anything because I will tell the State the truth.  You have a nice day tell Mr. Camacho to pray but if he killed Evellyn Bank an the baby boy he should an will pay.  But I will not have their blood on my hand.  NO!! WAY.

Concerning his assertion that the district court erred by refusing to allow discovery on Newton's recantation and to conduct an evidentiary hearing, Camacho maintains that discovery was necessary to determine whether counsel's suspicions about post-affidavit contacts by law enforcement agencies with Newton were responsible for his recantation.  And, he contends that he was entitled to depose the physician who performed the autopsy of Wilburn, to determine whether Wilburn was shot as Newton stated in his affidavit.

Camacho also maintains that the district court erred by denying his motion for authorization to employ an independent private pathologist.  In that motion, Camacho asserted that his counsel had informally consulted with Dr. Charles Petty, a pathologist and former Chief Medical Examiner for Dallas County, who testified at trial; that Dr. Petty reviewed the autopsy report and his trial testimony along with photographs of the crime scene; and that Dr. Petty was of the preliminary opinion that, although he testified at trial that the cause of death was consistent with an individual who had been forced to lie on the floor and had a weapon placed either at or near his body and the trigger pulled, the

physical evidence of the autopsy and crime scene is equally consistent with the version of events related in Newton's affidavit — that Wilburn was shot standing up just inside the doorway.

Camacho contends further that he is entitled to a CPC on this claim because someone other than Newton gave a similar account to the police and the news media on the day of the murder. In support, Camacho relies on a 20 May 1988 newspaper article, in which it is reported that a Dallas Police Officer said that "[w]hile the assailants were in the house, a visitor knocked on the door and was shot to death as he stood in the doorway", and that an unidentified witness said that, after Wilburn knocked on the door, "[s]omebody said come in and then they shot him right at the door".

Even assuming that a claim has been stated for federal habeas relief based on actual innocence, it fails for a number of reasons. First, as the district court noted, Newton recanted. Second, his affidavit falls far short of "a truly persuasive demonstration of 'actual innocence'". *See* **Herrera**, 506 U.S. at 417. In his affidavit, Newton claims to have observed the murder the day before it occurred. The record contains evidence that he had one misdemeanor and five felony convictions; and that Sheffield, the friend Newton claims to have been visiting on the day of the murder, did not live in either of the houses located directly across from Wright's. Newton's statement that the victim was already at Wright's house when the perpetrators arrived, and opened the door for them, is contradicted by testimony that entry into the house was forced and by crime scene photographs showing that a part

of the door frame was broken when entry into the house was forced, as well as by the newspaper article Camacho relies on, which states that the unnamed witness stated that the victim drove up after the suspects arrived and was killed after they opened the door for him. Finally, the affidavit is contradicted by the eyewitness testimony of three individuals inside the room when Wilburn was shot.

Camacho's conclusory assertion that unidentified law enforcement officers might have influenced Newton's recantation is speculative and insufficient to demonstrate the existence of a factual dispute that, if resolved in his favor, would entitle him to relief. Accordingly, for this claim, he was not entitled to expert assistance, discovery, or an evidentiary hearing.

C.

Relying on **Batson v. Kentucky**, 476 U.S. 79 (1986), Camacho contends that the prosecutor's exercise of peremptory challenges to exclude three minority venire members (Elizabeth Gamboa, who is Hispanic; Johnny Crowder and Charles Brooks, both of whom are black) from the jury were racially motivated and that the prosecutor's reasons for striking them were pretextual.

To establish a **Batson** violation, Camacho must prove, of course, that the strikes were motivated by purposeful racial discrimination. **Batson**, 476 U.S. at 94 n.18; *see also* **Purkett v. Elem**, 514 U.S. 765, 767-68 (1995). In a federal habeas proceeding, the trial court's rulings on discrimination and pretext are factual findings that are presumptively correct. *See* **Purkett**, 514 U.S. at 769 (quoting pre-AEDPA 28 U.S.C. § 2254(d)); **Washington v. Johnson**,

90 F.3d 945, 954 (5th Cir. 1996), *cert. denied*, ___ U.S. ___, 117 S. Ct. 1259 (1997).  Inasmuch as the factual findings on the **Batson** claims were made by the trial court after a live evidentiary hearing, we do not understand Camacho to contend that the presumption is inapplicable to these claims.

At the conclusion of *voir dire*, but before the jurors were sworn, the trial court conducted a hearing on Camacho's charge that the State's peremptory challenges were racially motivated; the prosecutor gave the following reasons for them.

As for Elizabeth Gamboa, he noted her youth (she was 24); she still lived at home with her parents; her apparent lack of understanding of some of the terms used in the indictment; and his belief that she was "just not assertive enough to make a critical decision on someone's life".

Crowder was struck because he indicated on his juror questionnaire that he did not believe in the death penalty, but testified during voir dire that, under certain circumstances, he did believe in it.  The prosecutor testified that he tried to make sure that no one was selected as a juror who had circled the following statement, as had Crowder, on his questionnaire: "Although I do not personally believe in the death penalty, as long as the law provides for it I could assess it under the proper set of facts and circumstances."

Finally, with respect to Brooks, his questionnaire appeared to be contradictory as to whether he believed in the death penalty; and, during voir dire, Brooks "could not adequately explain what to

me was a discrepancy [—] he didn't believe in the death penalty in one question. The next question was, he did believe in it, and he just ... he cannot adequately explain that answer." The prosecutor also had some concern that Brooks was answering the questions in a such a way as to ensure that he was selected as a juror, because the bailiff had told him that someone who would be questioned that day had expressed an interest in serving on the jury and had asked how to respond to the questions in a way that would ensure selection.

Following the hearing, the trial court made extensive findings of fact, including that the State gave no explanations based on group bias; that it had articulated nondiscriminatory reasons for the use of its peremptory challenges; and that there was no purposeful discrimination by it in the exercise of its peremptory challenges.

These findings are fully supported by the record. *See* 28 U.S.C. § 2254(d) (pre-AEDPA); *Purkett*, 514 U.S. at 769. Accordingly, Camacho is not entitled to a CPC on his *Batson* claims.

## D.

Camacho's final claim is that the admission of evidence of the murders of Evellyn and Andre Banks deprived him of a *Sixth Amendment* "right to a fair trial". At trial and on direct appeal, Camacho objected to this evidence on general relevance grounds. And, he did not present this claim in his state habeas application. However, he asserts constitutional grounds for the first time in his federal habeas petition.

The State contends that federal habeas review is barred by Camacho's failure to raise this claim in state court, because, if Camacho attempted to raise it in a new state habeas application, the Texas Court of Criminal Appeals would find an abuse of the writ. *See* **Nobles v. Johnson**, 127 F.3d 409, 423 (5th Cir. 1997). It contends further that state review would be barred by the absence of a contemporaneous objection on Sixth Amendment grounds. Alternatively, it contends that Camacho has not established that the admission of this evidence violated the Constitution.

It goes without saying that, in reviewing state evidentiary rulings, the role of federal courts "is limited to determining whether a trial judge's error is so extreme that it constituted denial of fundamental fairness." **Woods v. Johnson**, 75 F.3d 1017, 1038 (5th Cir.), *cert. denied*, ___ U.S. ___, 117 S. Ct. 150 (1996). "The test applied to determine whether a trial error makes a trial fundamentally unfair is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted." **Kirkpatrick v. Blackburn**, 777 F.2d 272, 278-79 (5th Cir. 1985), *cert. denied*, 476 U.S. 1178 (1986). "Habeas relief is warranted only when the erroneous admission of evidence played a crucial, critical and highly significant role in the trial." **Lucas v. Johnson**, 132 F.3d at 1082 (internal quotation marks, brackets, and citation omitted).

When considering challenges to the admission of extraneous offenses under the Due Process Clause of the Fourteenth Amendment, which guarantees "fundamental fairness" (*as noted, Camacho's claim*

*is based on his asserted Sixth Amendment "right to a fair trial")*, our court has considered two factors: whether there is a strong showing that the appellant committed the offense; and whether the extraneous offense is rationally connected with the offense charged. *See* **Pentecost v. Estelle**, 582 F.2d 1029, 1031 (5th Cir. 1978); **Hills v. Henderson**, 529 F.2d 397, 400 (5th Cir.), *cert. denied*, 429 U.S. 850 (1976).

Assuming that federal habeas review is not procedurally barred, Camacho has not shown that the evidence was admitted erroneously. First, there was a strong showing, through eyewitness testimony, as to Camacho's involvement in the kidnaping and murder of Evellyn and Andre Banks. And, those murders are rationally connected with Wilburn's; the murders of Evellyn and Andre Banks eliminated two of the eyewitnesses to Camacho's murder of Wilburn.

But, even assuming that the evidence was admitted erroneously, Camacho still has not shown that it had a substantial impact on the verdict or rendered his trial fundamentally unfair. As Camacho conceded in his brief filed in the Texas Court of Criminal Appeals on direct appeal, the evidence of his guilt was "overwhelming", and the State's case was "powerful and unimpeached". This is true even without considering the evidence of the murders of Evellyn and Andre Banks. Again, three eyewitnesses — Wright, Cooke, and Merrell — testified that Camacho shot Wilburn. Again, Wilson testified that she saw Camacho leaving the scene. And, again, Cummings testified that Camacho admitted to him that he had committed the murder. In sum, as the district court stated, the

evidence of Camacho's guilt for Wilburn's murder was so overwhelming that there is no reasonable probability that the jury would have acquitted Camacho had the evidence of the murders of Evellyn and Andre Banks been excluded. Accordingly, this issue also does not provide a basis for a CPC.

### III.

Because Camacho fails to establish a basis for a certificate of probable cause, his request for the certificate is **DENIED** and the stay of execution is **VACATED**.

*CERTIFICATE OF PROBABLE CAUSE DENIED;*
*STAY OF EXECUTION VACATED*